Charles A. Kaufman, et al. [1] v. Commissioner. Kaufman v. Commissioner
Docket Nos. 107762, 107769, 107770, 107771, 107782, 107792, 107796, 107808, 107809, 107810.
United States Tax Court
1943 Tax Ct. Memo LEXIS 184; 2 T.C.M. (CCH) 504; T.C.M. (RIA) 43355; July 24, 1943
*184 An arrangement effected pursuant to the provisions of a written contract whereby the parties thereto, who owned an interest in or rights under a certain patent or patents, severally appointed a common agent, with specifically limited powers, to grant licenses to hosiery manufacturers, to conduct patent litigation, and to collect and distribute royalties, did not constitute an association taxable as a corporation. Horace S. Manges, Esq., and James H. Mathias, Esq., for petitioner, Charles A. Kaufman. Clarence L. Turner, Esq., 1530 Chestnut St., Philadelphia, Pa. and Floyd F. Toomey, Esq., 606 Munsey Bldg., Washington, D.C., for petitioners, E. Richard Meinig, Berkshire Knitting Mills and Textile Machine Works. Noah A. Stancliffe, Esq., 30 Church St., New York City, Theodore L. Harrison, Esq., and J. Donald Rawlings, Esq., for petitioner, Julius Kayser & Co. C. Walter Randall, Jr., Esq., for petitioner, Hans P. Luhn. Joseph G. Denny, Jr., Esq., 1915 Land Title Bldg., Philadelphia, Pa., for petitioner, Estate of Paul Krenkel, Deceased. Theodore B. Benson, Esq., Normandy Bldg., Washington, D.C. and Arthur F. Morton, C.P.A., 2010 Girard Trust Co. Bldg., Philadelphia, Pa., for petitioners, *185 Mock, Judson, Voehringer Co., Inc., Greensboro Full-Fashioned Hosiery Mills, Inc., and F. Osborne Pfingst. Brooks Fullerton, Esq., for the respondent. HILL Memorandum Findings of Fact HILL, Judge: These are consolidated proceedings for the redetermination of the liability of petitioners as transferees of an enterprise designated by respondent as "Kaufman Patent Association." Respondent held that the enterprise was an association taxable as a corporation, and determined deficiencies against it as follows: Year
Income Tax
Penalty
1934
$ 3,115.18
$ 778.80
1935
42,897.43
10,724.36
1936
56,973.46
14,243.37
1937
37,536.69
9,384.17
Excess Profits Tax
Penalty
$ 1,132.79
$ 283.20
15,522.66
3,880.67
43,932.54
10,983.13
15,531.81
3,882.95
Petitioners allege (1) that no association existed within the purview of the taxing statute, referred to infra, as determined by respondent; (2) that if a taxable association existed, then respondent erred in certain respects in his determination of the deficiencies, and (3) that in any event petitioners are not liable as transferees. At the hearing, the parties filed a "Master Stipulation of Facts," applicable in *186 the cases of all petitioners, and in each case a "Stipulation of Facts No. 2" covering additional facts applicable to the particular case. The stipulations were supplemented by oral and documentary evidence. The facts stipulated by the parties are adopted in full as a part of our findings of fact, and will be set out below only to the extent deemed necessary to a discussion of the issues. Findings of Fact Textile Patents Corporation, hereinafter called Patents Corporation, was a Pennsylvania corporation organized on March 8, 1932, with its principal place of business at Philadelphia. It was organized for the following purposes: * * * to obtain, register, purchase, lease or otherwise to acquire and to hold, own, use, develop, operate and introduce, and to sell, assign, grant licenses or dispose of, any copyrights, trade marks, trade names, brands, labels, patent rights, letters patent of the United States or of any other country or government, inventions, improvements and processes, whether used in connection with or secured under letters patent or otherwise, and for these purposes to have, possess and enjoy all rights, benefits and privileges of the said Act of Assembly and its *187 supplements. The books of account of Patents Corporation were kept, and its Federal income tax returns were filed, on the basis of a fiscal year ending August 31. Applications for letters patent of the United States covering fullfashioned hosiery, particularly of real silk, and the methods of and means for making the same were filed by the persons, and were given serial numbers by the United States Patent Office on the dates, as shown below: Serial
Applicant
Date
No.
Charles A. Kaufman
May 20, 1932
612448
Paul Krenkel
Dec. 5, 1932
645664
Paul Krenkel (divisional)
May 23, 1933
672470
Gustav Gastrich
Mar. 9, 1933
660081
William M. Grosse
Mar. 11, 1933
660414
E. Richard Meinig
Mar. 24, 1933
652501
Henry Janssen
May 10, 1933
670220
Arthur F. Morton et al.
Aug. 18, 1933
685734
By reason of the conflicting claims involved in a portion of such applications, the Commissioner of Patents on July 6, 1933. declared and, on September 29, 1933, reformed an interference No. 66,586 between such applications in order to determine who was the first inventor of the conflicting subject-matter. On December 11, 1933, Patents Corporation and others entered into an agreement, *188 hereinafter called the 1933 agreement, which, so far as pertinent here, may be summarized as follows: There were 25 parties to the contract, identified as applicants, assignees, participants, hosiery mills, Textile Patents Corporation, and Textile Machine Works. The applicants consisted of eight individuals, including two who were apparently joint applicants but signed the agreement separately. There were nine participants, including five who also were designated as hosiery mills, and eight hosiery mills, including one also listed as an assignee. The "applicants" were parties to an interference No. 66,586 in the United States Patent Office for an invention relating to full-fashionea silk hosiery, and the contract recited that they were desirous (1) of making an immediate settlement of such interference. (2) of granting to Textile Patents Corporation an exclusive, non-assignable license to sublicense reputable hosiery manufacturers to use the invention, and (3) of utilizing the facilities of Patents Corporation for the promotion of the invention and the handling of patent litigation in that connection. The "participants" were directly or indirectly interested in the inventions, the *189 applications for which were involved in the interference, of certain of the listed applicants. The "hosiery mills" desired to obtain licenses to make and sell silk stockings embodying the invention covered by the pending applications, upon the terms and conditions set out in a form of license agreement attached to the contract. Textile Machine Works desired to obtain the exclusive right to manufacture and sell machines or attachments required for the manutacture of the invention. The "applicants" and "assignees", who were parties to the interference proceedings in the Patent Office, agreed to submit their claims of priority to the Examiner of Interferences and to abide by his decision; and each further agreed that, in the event priority of the invention was not awarded to him or to his assignee, he would execute and file in the Patent Office a concession of priority to the successful applicant within ten days after the decision of the Examiner of Interferences, and would not contest the validity of any patent thereafter granted. Each "applicant" and "assignee" agreed to grant to Textile Patents Corporation an exclusive, non-assignable license to grant sublicenses (subject to certain *190 restrictions and conditions) to hosiery mills to use and sell the inventions described in the applications and patents involved in the interference proceedings. Each party to the contract agreed that any improvement made by him to the invention would be available, without additional cost or the imposition of additional conditions, to any holder of a license or sublicense granted under the terms of the contract; and that the agreement should cover not only any patent or patents obtained by the successful applicant but any improvements to the invention and any renewal, continuations, divisions of or substitutions for the patent or patents. Each "applicant" and "assignee" assented that Patents Corporation should, within 20 days after execution of the contract by all parties thereto, grant a non-exclusive license to each of the hosiery mills listed therein, at a royalty of five cents per dozen for all hosiery manufactured according to or embodying the invention. These licenses were known as "A" licenses. It was also agreed that Patents Corporation should grant similar licenses to approved hosiery mills, other than those listed in the contract, at a royalty of ten cents per dozen. These *191 licenses were known as "B" licenses. But it was further agreed that in case Patents Corporation should grant any sublicense at a lesser royalty than ten cents per dozen, other than to "A" licensees, then the royalty payable by the "A" licensees should be one-half of the smallest royalty payable by any "B" licensee. Each "applicant" and "assignee" agreed that out of the royalties collected by Patents Corporation, it should pay to itself an annual retainer fee of $15,000, and of the balance of the royalties collected 50 percent should be set aside in a fund (called a sinking fund) for patent litigation expenses until such fund amounted to $25,000. The remaining 50 percent of the royalties collected, and all royalties collected after there had been paid into the sinking fund the aggregate sum of $25,000, was to be distributed quarterly by Patents Corporation as follows: pending determination of the successful applicant, 10 percent to Patents Corporation and 6 2/3 percent to each applicant or his assigns; the remaining 43 1/3 percent to be accumulated and held by Patents Corporation until determination of the successful applicant and thereupon paid over to him or his assigns. Royalties *192 collected after determination of the successful applicant were to be distributed 50 percent to the successful applicant or his assigns, 10 percent to Patents Corporation, and 6 2/3 percent to each of the unsuccessful applicants or their respective assigns; and any balance remaining in the sinking fund five years after execution of the agreement was to be distributed in the same manner. Patents Corporation agreed diligently to collect the royalties, and to hold and dispose of the same as provided in the agreement, and that all funds so held by it should be in trust solely for the purposes of the agreement. Patents Corporation agreed to furnish to each applicant or his assigns quarterly reports of all hosiery, embodying the invention, manufactured and sold by the sublicensees, and the total amount of royalties paid therefor. The various applicants and their assignees were given the right, within reasonable hours, to inspect the records of Patents Corporation, to verify such reports. Each of the parties to the contract agreed that upon demand of Patents Corporation he or it would execute, for a consideration of $1 only, an exclusive license agreement (revocable at the option of the *193 licensor upon termination of the present contract) covering any attachment or machine that he or it might own or control necessary to the successful manufacture of the hosiery invention involved in the interference proceedings above mentioned, with the understanding that Patents Corporation would grant, for a like consideration, a non-assignable and exclusive sublicense to Textile Machine Works for the maunfacture and sale of such attachments or machines, sales to be made only to sublicensees of Patents Corporation in respect of the hosiery invention. It was agreed between the parties to the contract that within 30 days after the granting to one of the applicants or his assigns of a patent upon the invention involved in the interference proceedings, a committee of three individuals should be formed, consisting of (1) William R. Smith (vice-president of Patents Corporation), (2) the successful applicant or his assignee, and (3) an individual elected from among the unsuccessful applicants or assigns. It was provided that such committee should have the sole and exclusive power by a majority vote to (1) determine the hosiery mills to whom sublicensees might be granted, (2) designate *194 the attorney or attorneys to handle patent litigation, and (3) determine all matters concerning the expenses of such litigation. In case of the death of William R. Smith, or if he should cease to be an officer of Patents Corporation or should cease to be a member of the committee, Patents Corporation was given the right to appoint an individual, approved by a majority vote of all the applicants or their assigns, to fill such vacancy. In case the second member should cease to be a member of the committee, the then holder of the patent or patents was authorized to appoint an individual to fill that vacancy. The third member of the committee might be removed at any time by the majority vote of the unsuccessful applicants or their assigns, and in case the third member should cease to be a member of the committee for any reason, the unsuccessful applicants or their assigns were authorized to elect an individual to fill such vacancy. The successful applicant or patentee agreed to grant to Patents Corporation an exclusive license to grant sublicenses in accordance with the form attached. Patents Corporation agreed to furnish quarterly to the patentee and to each of the unsuccessful applicants *195 or assignees a compiled statement of the various statements received from all sublicensees, showing the amount of hosiery manufactured and the royalties paid thereon. Patents Corporation agreed to require all sublicensees to affix necessary patent notices to all their hosiery, and to require of all sublicensees that "first quality" hosiery manufactured by them would be first quality in every respect and conform to the specifications of samples filed by each licensee and approved in writing by Patents Corporation. The patentee agreed to grant to Patents Corporation, during the life of the contract, the right to sue in its own name, and if necessary to join the patentee as a party plaintiff, to establish validity of the patent and to collect such damages and profits as might be assessed, such damages and profits to be distributed 50 percent to the patentee, 10 percent to Patents Corporation and 6 2/3 percent to each of the unsuccessful applicants or their assignees, if any. Patents Corporation agreed that whenever called upon to do so by the patentee "in necessary and proper cases" during the period of the contract, it would prosecute all infringements of the patent, legally establish *196 validity of the patent and protect the rights of the patentee, all costs, including attorneys' fees, to be paid out of the sinking fund of $25,000. In the event that Patents Corporation failed faithfully to perform the contract, in so far as concerned the interest of the patentee, or in the event Patents Corporation was prevented from carrying out the agreement by reason of receivership, bankruptcy or financial difficulties, it was provided that the license granted to Patents Corporation, and all of its rights under the agreement, should cease and terminate upon 30 days written notice given by the patentee. And in the event of such cancellation of the license by the patentee, the rights of Patents Corporation under the contract were to vest in a successor corporation to be designated by a majority of the applicants and hosiery mills listed in the contract, who were then holders of sublicenses. It was provided that the successful applicant or patentee, or any "unsuccessful applicant" or applicant, after assignment of his entire interest, should not be entitled to participate in the selection of an arbitrator or to membership on any committee, or to exercise any power or privilege *197 conferred by the terms of the contract, but that all such powers and privileges should be vested in and exercised by the assignee or assignees of such entire interest The subject-matter of the contract of December 11, 1933, was unknown at the time Patents Corporation was organized. Between January 1 and January 10, 1934, Patents Corporation issued to each of the eight hosiery mills named in the 1933 contract, a license in the form appended to that agreement. On August 7, 1934, United States letters patent No. 1,969,307 was issued to Charles A. Kaufman, the successful applicant under the 1933 agreement. Thereafter, on August 28, 1934, Kaufman assigned his entire interest in the patent to Julius Kayser & Co. Various other assignments of interests in the subject-matter of the agreement were made by other parties thereto. Some of these assignments were made prior and some subsequent to December 11, 1933. Charles A. Kaufman, the patentee, was connected with Julius Kayser & Co. as manager of their hosiery department. During the course of the negotiations which preceded execution of the 1933 contract, Patents Corporation suggested that the patent, when granted, should be assigned to *198 it. On October 5, 1933, a letter was written by Julius Kayser & Co. to Patents Corporation, with the knowledge and consent of Kaufman, reading in part as follows: * * * it seems neither necessary nor advisable that the patent be assigned to Textile Patents Corporation. The appointment of Textile Patents Corporation as the agent of the holder of the patent for the purpose of granting licenses, with duties subject to such limitations as the patentee may deem proper, would seem to suffice for the purpose. William R. Smith, vice-president of Patents Corporation, Charles A. Kaufman, the successful applicant, and Ferdinand Thun, president of Berkshire Knitting Mills, the representative of the unsuccessful applicants, became members of the committee prescribed by the 1933 agreement. No meeting of this committee was ever held, and it never functioned. Kaufman, a member of the committee, approved the names of six prospective licensees out of more than 100 hosiery mills to whom licenses were issued, and approved the designation of one of several patent attorneys. Patents Corporation submitted all matters for decision to all of the interested parties, and received instructions from them. Between *199 January and August 1934, hosiery mills who were not parties to the 1933 agreement, referred to as the outside group, refused to accept licenses in the form provided in such agreement, and during the period mentioned several meetings of the parties to the agreement, sometimes called "all interested parties", were held for the purpose of considering revision of the "B" license. Throughout the year 1934 negotiations among all the interested parties were carried on at group meetings and by correspondence, and in the latter part of December 1934, agreement was finally reached by all the interested parties on the terms of a revised form of "B" license. The new license provided for a royalty of five cents (instead of ten cents) per dozen pairs of hosiery, and otherwise differed substantially from the form of license originally attached to the 1933 agreement. During the period January 1 to April 13, 1935, Patents Corporation granted "B" licenses in the form agreed upon to more than 110 outside hosiery mills. No licenses were thereafter granted. Notwithstanding the fact that the "B" licensees were required to pay a royalty of only 5 cents per dozen pairs instead of 10 cents per dozen, as *200 provided in the 1933 agreement, the "A" licensees severally agreed to and continued to pay the royalty of 5 cents per dozen pairs as provided in their license agreements. No license with respect to any apparatus necessary to the manufacture of the invention covered by patent No. 1,969,307 was ever granted to Patents Corporation under the 1933 agreement, and Textile Machine Works never fulfilled the conditions which would have entitled it to a sublicense for the manufacture and sale of the attachments or machines for the manufacture of hosiery under the patent. On February 20, 1935, suit was brought in the United States District Court for the Eastern District of Pennsylvania by Julius Kayser & Co. and Patents Corporation against Rosedale Knitting Company for an injunction, profits and damages for infringement of patent No. 1,969,307. On April 13, 1937, the District Court filed an opinion holding that the patent was invalid (18 Fed. Supp. 836), and on June 25, 1937, a decree was entered in accordance therewith. On July 23, 1938, the decision of the District Court was affirmed by the Circuit Court of Appeals for the Third Circuit (98 Fed. (2d) 839). *201 On November 21, 1938, the Supreme Court of the United States denied a petition for certiorari (305 U.S. 649). After decision of the District Court that the patent was invalid, some of the licensees demanded that arrangements be made whereby the royalties, which would accrue during the period pending appeal of the District Court's decision, would be placed in escrow, with the understanding that the royalties so collected would be paid to Patents Corporation if the patent were sustained and that they would be returned to the licensees if the patent should finally be held invalid. Decisions in respect of this matter and of enforcing collection of unpaid royalties were made by correspondence between Patents Corporation and all interested parties. The only records with respect to transactions under the 1933 agreement were kept by Patents Corporation. That corporation kept no record of any minutes of the several group meetings of the interested parties, nor did it keep any record of assignments by parties to the agreement. There were no by-laws, stock books, certificates, stationery or seal, other than those of Patents Corporation. As royalties were collected *202 by Patents Corporation under licenses granted pursuant to the 1933 agreement, they were credited on the books of Patents Corporation to an account called "Royalties Payable - Ringless," a liability account. To this account were charged (a) the compensation of Patents Corporation, (b) the amounts transferred to the sinking fund, and (c) distributions to the participants. The amounts charged on account of the sinking fund were credited to another liability account called "Royalties Withheld," to which were charged legal and other expenses as paid. Patents Corporation made written quarterly reports to all interested parties, showing receipts and disbursements. During the taxable years 1934-1937, both inclusive, Patents Corporation collected royalties under the various licenses in the aggregate amount of $996,242.80, and received interest on bank deposits of $399.04. From the total receipts of $996,641.84, it made disbursements in the aggregate amount of $411,081.14. The disbursements included its own compensation of $122,071.02. It paid litigation expenses of $285,900.89, and miscellaneous expenses of $3,109.23. It distributed $558,639.06 to petitioners in these proceedings, and had *203 on hand at December 31, 1937, an undistributed balance of $26,921.64. Patents Corporation included in its Federal income tax returns the amount of its compensation for the fiscal years in which received. The amounts distributed by Patents Corporation to the several surviving petitioners were included by the parties entitled thereto in their respective Federal income tax returns for the taxable period in which received. On December 19, 1938, Julius Kayser & Co. reassigned United States patent No. 1,969,307 to Charles A. Kaufman. As of July 20, 1939, an agreement was entered into terminating the contract of December 11, 1933. Opinion Respondent determined that the parties to the agreement of December 11, 1933, created thereby an association taxable as a corporation within the meaning of sections 801 (a) (2) and 1001 (a) (2) of the Revenue Acts of 1934 and 1936, which provide simply that the term "corporation" includes, among other things, "associations." Since the alleged association filed no income tax returns for the years embraced within the period during which the 1933 agreement was operative, respondent determined the deficiencies in tax and delinquency penalties here in controversy *204 on the basis of including in gross income the total royalties and other receipts collected by Textile Patents Corporation, and of allowing as deductions therefrom (1) the commissions or compensation retained by Patents Corporation for its services, (2) miscellaneous expenses, and (3) allowances for amortization of the patent. Certain litigation expenses were capitalized by respondent and not allowed as deducted from gross income. The 1933 contract having been terminated in 1939, respondent determined that the 10 petitioners herein are liable severally for the taxes and penalties assessed against the alleged association to the extent of the amounts distributed to each of them respectively by Patents Corporation. The principal contentions of the petitioners are, (a) that no "association" was created by the 1933 agreement, within the purview of the revenue acts; (b) that if a taxable association existed, respondent erred in his determination of the deficiencies by failing to allow certain expenses incurred in patent litigation, and other items, as deductions; and (c) that he erred in holding that petitioners, or any of them, are liable as transferees. The first question for consideration *205 is whether an association taxable as a corporation was created by the 1933 contract. Admittedly no such association operated as a business entity by name, and so respondent has designated the alleged primary taxpayer as "Kaufman Patent Association." As has been said many times, no rule can be formulated with sufficient particularity to determine in all cases precisely what constitutes a taxable association under the revenue acts. The answer to the question presented depends upon the facts and circumstances of the particular case. However, the presence or absence of certain factors may be determinative. In the leading case of Morrissey v. Commissioner, 296 U.S. 344, the Court remarked that, "The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity." The Court then pointed out some of the salient features which may be regarded as making an enterprise analogous to a corporate organization, including the following: (a) an entity holding title to the property embarked in the undertaking; (b) a continuing body, with provision for succession; (c) centralized management through representatives of the members; *206 (d) transfers of beneficial interests without affecting continuity of the enterprise; and (e) limitation of personal liability of the participants. In the proceedings at bar we are unable to find any of the essential characteristics of a corporate organization. There was no business or operating entity, separate and apart from the parties to the contract, which held title to any property embarked in the undertaking. No records were kept comparable to minutes of meetings of corporate stockholders or directors. The only records in respect of the transactions under the agreement were kept by Patents Corporation, and it kept no records or minutes of group meetings of the interested parties, nor did it keep any records of assignments by the parties. There were no by-laws, stock books, transferable certificates of beneficial interests, stationery or seal, other than those of Patents Corporation. There was no provision for limitation of personal liability. There was nothing analogous to a board of directors or stockholders. There was complete absence of centralized management; no person or group of persons had any general powers to carry on a business venture. Patents Corporation had no *207 general powers or authority; its duties were ministerial, and fully described in detail. It could institute patent litigation at the request of the patentee, grant sublicenses to reputable hosiery mills in accordance with the stipulated form attached to the contract, collect royalties and, after payment of operating expenses, distribute the balance to the persons and in the percentages prescribed in the agreement. In all other matters, Patents Corporation could act only upon consent of all interested parties. The 1933 contract did contain a provision for the formation of a committee of three individuals, consisting of (a) a representative of Patents Corporation, (b) the patentee, and (c) one of the unsuccessful applicants. However, no general powers were vested in this committee; it was authorized to do three things only, (1) approve hosiery mills to whom "B" licenses might be granted, (2) designate an attorney or attorneys to handle patent litigation, and (3) determine matters concerning expenses of such litigation. The members of this committee, each, represented a particular individual or group of parties to the contract, and not the group as a whole. The representation plainly *208 was several, not joint. Cf., Cooperative Power Plant, 41 B.T.A. 1143, 1150. And it may be noted that this committee never functioned. The facts of this case disclose, in brief, that seven individuals, who had filed applications for a patent covering a supposed invention for the manufacture of silk hosiery, all of such similarity as to result in an interference proceeding in the Patent Office, entered into an agreement in 1933 to effect two principal purposes: first, to expedite decision of the interference proceeding, and to facilitate the early granting of a patent to some one of them; and second, to effect the accrual to each applicant of some benefit under the patent in the form of a percentage of the net royalties. So much having been agreed upon, it appeared necessary and desirable to provide some convenient instrumentality for the granting of licenses to hosiery mills and for the collection and distribution of royalties. This was accomplished by the appointment of a common agent for the several owners of rights under the patent. Patents Corporation was the agent selected. That it was the intention of the parties to appoint an agent to represent *209 them severally rather than to form a business association or to appoint an agent to represent the group collectively, is quite clearly indicated by the facts. Such an arrangement, involving only the common relationship of principal and agent, does not constitute an association taxable as a corporation. Lewis & Co. v. Commissioner, 301 U.S. 385. See also C. A. Everts, et al., 38 B.T.A. 1039; E. L. Cord, 38 B.T.A. 1372; Cooperative Power Plant, supra;P-H Group, 43 B.T.A. 1041. The conclusion reached renders it unnecessary to discuss the additional or alternative issues raised by the parties, and they become immaterial. We have, therefore, omitted such facts from our findings hereinabove. Decisions will be entered for petitioners. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: E. Richard Meinig; Berkshire Knitting Mills; Textile Machine Works; Julius Kayser & Co.; Hans P. Luhn; Estate of Paul Krenkel, Deceased, Alleged Transferee, Mrs. Elizabeth Klara Krenkel, Executrix; Mock, Judson, Voehringer Company, Inc.; Greensboro Full-Fashioned Hosiery Mills, Inc., Alleged Transferee; F. Osborne Pfingst, Alleged Transferee. ↩